Losing, J.,
dissenting:
It was not claimed in this case that the petitioner was chargeable with any direct complicity in the fraud of Watrous and Gallaer, and all that is claimed is that there were such laches on his part as should defeat his title $ and that I think is the question here.
And I understand the rule of law for subsequent purchasers as to implied or constructive notice, to be that stated by Ld. Oh. Cranworth, in the case of Ware v. Egmont, 3 Myl. and Keen, 719, and repeated in Montifiore v. Brown, 7 H. of Lords, ca. 241,269, and made the text of Mr. Sugdon ,(pp. 755,782) in his 10th edition of his treatise on vendors and purchasers. And the rule was stated by the Ld. Oh. thus: “The question, when it is sought to affect a purchaser with constructive notice, is not whether he had the means of obtaining, and might by prudent *532 caution have obtained, tbe knowledge in question, but whether the not obtaining it was an act of gross or culpable negligence.”
And I think the result is that the law does not require that purchasers for value should be suspicious or sagacious or diligent, but only that they should be honest; and that they are liable only for that gross and culpable negligence which the law makes equivalent to fraud and evidence of it.
And the rule is laid down as to prior incumbrances or mortgages only, facts existing without fraud, and against which no presumption arises, and certainly no stricter rule as to inquiry can be laid down, when fraud is to be inferred from circumstances, for fraud is to be presumed against by individuals as well as courts.
The particular fraud in this case committed against the United States by Gallaer and Watrous consists of two circumstances: 1st, that Watrous and Gallaer obtained the lease by Gallaer’s fraudulent representations in his letter to the Secretary; 2d, by the suppression of Gallaer’s ownership of half the premises.
As to the first, there is nothing in the evidence indicating that the claimant had any knowledge of Gallaer’s letter to the Secretary, or of its contents, and it was not claimed at the trial; it was disclaimed. The letter, therefore, and its fraudulent representations are to be laid out of the case.
Then as to the second fact, the suppression of Gallaer’s title. The claimant knew that Gallaer did not sign the lease, and that the deed from Watrous conveying to him the title of half the premises was on the public record. But he knew also the fact, shown by the evidence here, that the deed was on the record, and had been for nearly a year, when the lease to the United States was made; and the suppression of a title is not to be inferred from its being put upon the public records.
Besides, it was the oficial duty of the Secretary to ascertain the validity of the title he took, and what the records showed in relation to it, and for this he had plenary means; for the law gave him the services of the district attorney of the locality for the very purpose, and it was directly in the course of ordinary official procedure that he should use them; so that he could only fail to know of the recorded deed by a most unusual dereliction of duty, amounting to gross and culpable negligence on his part; and under the circumstances, and the official rela *533 tions of tbe Secretary and tbe collector, I tbink it was not obligatory on tbe claimant to infer culpable negligence in tbe one and fraud in tbe other, and therefore to inquire if tbe Secretary knew of tbe recorded deed; and I cannot adjudge that tbe claimant was guilty of that culpable negligence in not doing so which should defeat bis title; for if he presumed the Secretary knew of tbe deed, and acted on that presumption, he only did what tbe law itself does.
Besides, a recorded deed is notice to everybody, and to tbe United States as well as to anybody else. And I tbink they cannot be permitted to say they did not know of a recorded deed to shift tbe consequences of tbe culpable negligence of their own agent on to tbe claimant’s failure to make inquiries as to a fraud of which be knew nothing. I suppose it is certain that a purchaser is not bound to inquire whether an individual knows of a recorded deed, because tbe law charges him with it, and I tbink tbe United States subject to tbe same rule of law.
It was strenuously urged at tbe bar that the building was unfit for its purpose, and that tbe claimant must have known this. I tbink this rests on tbe misapprehension that it was used as a custom-house warehouse, when tbe evidence shows it was not, but only for offices in tbe collection of tbe revenues. Gallaer’s letter states tbe fact that for want of warehouses in Benicia, vessels arriving there were made “ constructive ivarehouses ” of their own cargoes, and that was tbe practice. And Hayden, tbe witness who knew most about the premises, says be never knew them used bufonee for a warehouse for a single cargo; and that was in 1857, two years before tbe lease was made. Tbe claimant knew what the building was used for by bis own observation, and what it was hired for by tbe lease, and that says not a word of a warehouse, but only this: u now in tbe occupancy of, and used by, tbe United States in tbe collection of the customs of tbe port,” and that is a descrixrtion of tbe collector’s offices.
And there is nothing to show tbe premises were not fit for such offices, and quite as fit as those afterward hired by Miz-ner; because for offices no wharf was necessary for discharging, and no road necessary for transporting cargoes, for these are not carried to or from offices.
Then it was said the rent was exorbitantly high, and Hayden says that in March, 1853, it could not have been hired to an in *534 dividual for more, or much more, than half the rent received. This proves the United States was made to pay higher than a private person, and that is not unusual. But better evidence of what could be then done is what others did. Mizner in July, 1853, paid $350 for two small buildings, one on a hard street, the other behind it; but this, so far as shown, gave no accommodation for the custom-house boat and its crew, which are indispensable for a custom-house, and must be provided for; and if a house for the boat and a room for her crew are to be added to Mizner’s reut, it would be little if any lower than that received. Then it is in evidence that, when the lease was made, rents were speculatively high from the fact that Benecia was to be made the capital of the State, and Hayden says that when the lease was made there was only one other building near the landing ñt for offices of any kind, and that was occupied then by himself. I do not find, therefore, in the evidence proof of that unfitness in the building, or exorbitancy of rent, that would require a presumption of fraud, or inquiry into it by a purchaser, and fix upon him culpable negligence for not inquiring.
The remaining circumstance is much more grave, and I think more suspicious than all the rest; and that is the price the claimant paid for the lease and the fee, which was $8,000, when, l)3r the lease for two years certain, at $6,000 a. year, he would get $12,000 and have the fee of the premises also. Admitting what is shown — that money in California was worth three to five per cent, a month — the price was an extreme under-price, calculated to induce suspicions as to the seller’s reasons for selling; but then this was a question as to Watrous’s motives, and it in no way indicated the particular fraud alleged here, and furnished the claimant no fact as to that leading to inquiry into it. It might, as mi under-price always may, be referred to the pressure of the vendor’s circumstances and his need of money then, or facts in his business the vendee could not know and had no right to inquire about; and therefore it is always held that mere under-price, without advantage taken of the vendor’s ignorance or inferiority, is not enough to defeat a title.
And on this whole case I cannot say that the evidence satisfies me the judgment ought to be against the claimant. And the burden of proof is on the defendants; and he who alleges a fraud or its equivalent must prove it.